[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
Two years after being awarded custody of Eric H., born August 19, 1983, the Department of Children and Youth Services (DCYS) by petition filed April 5, 1990, seeks to terminate the parental rights of Dawn H. and Christopher F., his mother and acknowledged father. The petition alleges, pursuant to subsection (d) of Sec. 17-43a applicable to children previously committed as neglected or uncared-for, the mother's failure to rehabilitate and, as to both parents, the absence of a parent-child relationship with the allowance of further to establish or reestablish such relationship alleged to be detrimental to the child's best interests. On August 23, 1990, the first date of trial, the petitioner by oral amendment added a third nonconsensual ground for terminating the rights of both parents: Abandonment in the statutory sense of a failure to manifest a reasonable degree of interest, concern or responsibility for the child's welfare for a period in excess of one year.
Although at the time of filing the child had been living with his paternal grandmother for more than a year, the address of her son, the child's father, was unknown necessitating notice by publication as provided in subsection (c) of Sec. 45-61d. Christopher F. appeared at none of the ensuing hearings, and no attorney was appointed to represent him. In Re Bobby Jo S., 10 Conn. App. 36 (1987). Dawn, having been personally served, appeared for the initial hearing on May 3, 1990, contested the allegations of the petition, and applied for an attorney pursuant to subsection (b) of Sec. 46b-135. On the petitioner's motion, a psychological evaluation was ordered to be conducted by the same clinical psychologist who had evaluated the family two years earlier at the time of Eric's commitment to DCYS. Because Dawn failed to appear at both scheduled appointments, only Eric and his grandmother had been evaluated at the time trial started on August 23, 1990. On that date, Dawn also failed to appear, although her attorney confirmed that she was aware of the trial date and had assured counsel nine days earlier that she intended be present. Her, attorney's request for a continuance was denied in the absence of either a valid excuse for her nonappearance or any assurance that she would appear on any subsequently scheduled trial day. Since the trial was not concluded on August 23, 1990, however, Dawn's attorney moved to reschedule the appointments with the clinical psychologist, based upon information that Dawn had failed to keep the first appointment because she was hiding from a boyfriend who knew the date and time for the first appointment, found her later that day and shot her, inflicting serious injury. Upon this representation, the motion was granted and appointments were rescheduled for Dawn to be seen CT Page 3872 individually and with her son at two separate times on September 5, 1990. She subsequently failed to appear for either of those appointments, or to notify the evaluator, the court, or her attorney of any reason for her nonappearance. On the continued trial date of October 1, 1990, Dawn again failed to appear. Her attorney represented that she had spoken a few days earlier to Dawn who had again confirmed that she was aware of the trial date and planned to attend. As on the first trial date, no offer of any valid excuse for her nonappearance was made, nor could her attorney guarantee that she would appear at any subsequently scheduled trial date. All parties rested at the conclusion of the second trial date and were given to November 5, 1990 for the submission of trial memoranda and responses thereto.
Facts
Evidence offered in two days of trial, interpreted in the light of the prior court record concerning this child, of which judicial notice is taken, supports the finding of the following facts:
Two weeks after Dawn H. turned 17, she gave birth to Eric H., the first of four out of wedlock children who would be born to her before her 22d birthday. At the age of two, Eric's custody was transferred in the Probate Court from Dawn to her parents after repeated episodes of neglect when in his mother's care: Twice he had been admitted to hospital for overdose of tegretal, a drug prescribed for his seizures; once he had to be hospitalized after falling from a second floor balcony while his mother was supposedly watching him.
Eric entered Headstart in the fall of 1987, at the age of four, and immediately began demonstrating unusually sexualized behaviors. After three months in school, he disclosed both sexual and physical abuse by his maternal grandparents during a period when his mother was also residing in the home. The family was referred for counselling, but nothing more was done to protect the child until March of 1988 when his 16-year old uncle (Dawn's younger brother) reported chronic sexual and physical abuse as well activities involving child pornography in the home on the part of his parents, Eric's legal guardians. DCYS filed neglect petitions, naming the maternal grandparents as respondents, and secured an Order of Testimony Custody on March 14, 1988. During the pendency of that petition, Dawn, her parents and Eric were ordered to be evaluated by a clinical psychologist, Dr. Bruce Freedman, to whom Dawn admitted being aware of, and upset by, the bizarre sexual practices of her parents: Group sexual encounters, entertainment of "swingers", child pornography. CT Page 3873 Although she had known that Eric witnessed these practices, she had agreed to the transfer of his custody to her parents in the Probate Court. She also admitted that she was aware of her father's physical abuse of Eric and the inability of her mildly retarded mother to effectively intervene. (Neglect Proceeding: Report of Dr. Freedman submitted April 15, 1988.) Dawn, however, denied all responsibility either for the earlier neglect of Eric that had led to the transfer of his custody to her parents in 1985, or for the sexual and physical abuse that led to the intervention of DCYS in March of 1988. Although having had two other children whose custody she had never relinquished, she had done nothing to regain Eric's custody notwithstanding her knowledge of the abuse he suffered at the hands of her parents.
Dawn had attended the individual session with Dr. Freedman, but failed to come for an interaction session with Eric despite having been reminded of it 90 minutes before the scheduled time. Although Dr. Freedman had found from his interview with Dawn that she had no strong attachment for Eric, he saw no reason why she should not be able to have short visits with him if she should request to do, so.
Dawn had appeared at the first hearing on the petition alleging neglect by her parents, but she failed to appear on June 16, 1988 when her parents, with the concurrence of her own court appointed counsel acting on her behalf, admitted that Eric had been neglected in then care and agreed that he could be committed to DCYS for an initial period of 18 months pursuant to subsection (d) of Sec. 46n-129. Dawn offered no alternative plan for Eric's case at that time. Expectations were spelled out for the maternal grandparents if they elected to work toward reunification with their grandson. The principal expectation was for their engagement in counselling. No expectations were spelled out for Dawn due to her absence from court on that occasion, but her attorney agreed that a review in court would be requested for this purpose, if and when he succeeded in making contact with her. No such request was ever made and Eric's commitment to DCYS began July 15, 1988, the date the court received the study mandated by subsection (c) of Sec. 46b-129.
The following year, on July 6, 1989, Christopher F. appeared in this court for the first and last time, provided proof that he had acknowledged paternity of the child in December of 1983, and agreed to a support order sought by the Bureau of Collection Services.
In his first 11 months in DCYS custody, Eric's foster placements had twice disrupted. In February of 1989, with CT Page 3874 Dawn's express approval, Eric was placed in the home of Diane F., his paternal grandmother. Seven months later, on September 15, 1989, DCYS petitioned to transfer his guardianship to Diane F. Both parents were served by certified mail but neither appeared in court on the proposed transfer on October 3, 1989. By that time, however, Diane F. had decided for health reasons not to assume legal responsibility for her grandson, although she continued to be willing to serve as his foster mother as long as she was able. The revocation petition was therefore dismissed without prejudice and on November 15, 1989 DCYS filed a petition to extend Eric's commitment beyond the initial period of 18 months, as required by subsection (e) of Sec.46b-129. Both parents were served for the extension hearing: Neither appeared. By default, the commitment was extended for a second 18-month period effective January 15, 1990, without prejudice to the rights of any party to seek a change in Eric's legal status at any time.
Since the plan for transferring guardianship to the paternal grandmother had aborted, DCYS investigated other relatives as possible long-term placements since the maternal grandparents had fulfilled none of the court's expectations (principally for counselling related to their sexual practices) which would permit consideration of returning the child to their care. All their visitation with the child and contact with DCYS had ended at the time of Eric's placement with his paternal grandmother in February of 1989. Since Christopher F. had never offered a plan for his son other than placement with his mother, DCYS attempted to reinvolve the mother. Notes were left repeatedly at her home but produced no response. It was not until a registered letter was sent informing her of a proposed plan to seek termination of parental rights did she finally make contact with DCYS. Her call to the DCYS social worker in February of 1990 was the first time she had contacted the child's legal guardian since a phone call a year earlier in which she had agreed to the child's placement with the paternal grandmother. In her conversation of February of 1990, for the first time Dawn said that she wanted to provide a home for Eric herself, notwithstanding that she had only visited him two or three times in the year that he had been with Diane F. (State's Exh. B., p. 2.)
Since no change in Dawn's absence of contact with the child or his caretakers was noted following this telephone call, DCYS proceeded with its plan by filing the instant petition with which Dawn was personally served on April 8, 1990. Later in April of 1990 she was invited to the semi-annual administrative review of the treatment plan for Eric. Despite her professed opposition to the plan for termination of parental rights and her voiced desire to resume CT Page 3875 his care herself, she failed to appear at this administrative review, as she had failed to attend each of the preceding administrative reviews conducted since the child's placement with DCYS. She did appear at the plea hearing on the termination petition and at a pretrial conference the following week, and her attorney confirmed that she was aware of the appointments set up with Dr. Freedman. She failed to appear for these appointments because a man who identified himself as her "friend" appeared at Dr. Freedman's office twice on the morning of the appointment. Later that day, he reportedly located her and shot her, critically wounding her. Her injuries precluded her attending the second appointment scheduled for the following day. Four months later, however, when both of these appointments had been rescheduled at the request of her attorney, Dawn failed to appear. This time no excuse was offered for her nonappearance, just as no excuse was offered for her failure to appear at both trial dates. During the 18 months preceding the adjudicatory date (August 23, 1990), Eric had been living with the paternal grandmother only three or four blocks away from where Dawn then lived. According to the grandmother, Dawn ". . . doesn't come by that often", to her recollection perhaps a "couple of times" in the preceding six months. (Testimony of Diane F., August 23, 1990.) On one occasion, in March of 1989, Dawn had given Diane $50 for Eric. She had brought him clothing in the summers of 1989 and 1990, and gifts on his sixth birthday and at Christmas of 1989. On his seventh birthday — four days before the first trial date — Dawn asked to take him for a visit off premises. Diane said she could not permit this, but invited Dawn to visit him in the foster home. Dawn did not come or call or send a gift or a card. Diane F. had urged her to come more often and had never refused to let her visit her son. Dawn offered no reason for her failure to visit Eric, and many of the contacts with him that did occur were incidental to bringing her daughter, Tequanna, over for Diane to baby sit. (On same occasions Tequanna would be left for weeks at a time with Diane F.) Diane could only recall one evening that Dawn had spent visiting with Eric; all other contacts with him were one-half hour or less. When Dawn had been injured by her male friend in May of 1990, Diane brought Eric to visit her in the hospital, but on her discharge Dawn made no attempt to see him again.
When Dawn first started visiting Eric in Diane's home, he referred to her as "Tequanna's mother", after spending 11 months in two DCYS foster homes where there was no evidence that any visitation had taken place. Later, after further visits, Eric accepted her as his mother also, enjoyed her visits, and wondered aloud to Diane why he could not go home with her when she came to bring Tequanna home. He appeared to accept the fact, however, that he could not. He appeared also CT Page 3876 to enjoy her visits, as he did with his father who lives in a nearby town and visits on occasion — four times in the six months preceding Diane's testimony.
The social worker who had the case from soon after Eric's commitment to DCYS in July of 1988, had attempted, but had not succeeded in making, contact with Dawn other than the telephone call in February of 1989 in which Dawn voiced approval of Eric's placement with the paternal grandmother. The next contact was not until February of 1990 when, in response to written notice of the impending termination date, she called DCYS to say she wanted to care for Eric herself if Diane became unable to keep him. In the later conversation, the social worker informed Dawn what she would have to do to be considered for reunification with her son: Regular visitation and engagement in counselling in conjunction with Eric's at Child and Family Service. In the six months between that conversation and the adjudication date, Dawn kept only two appointments at Child and Family Service and visited the child only two or three times. The social worker also contacted Christopher F. who offered no plan in the event his mother could no longer keep Eric: He could not, he told the social worker, fit Eric into his life or his work schedule.
Dr. Freedman saw Eric in May and again in September of 1990 in connection with the instant petition. He found him to be a traumatized, emotionally disturbed child who would need treatment and special handling by his primary caretakers for years in the future. In his single encounter with Dawn in 1988 followed by the missed appointments in 1990, Dr. Freedman saw no indication that Dawn would be able to provide for Eric. (Testimony of October 1, 1990): She would be "absolutely unable" to meet his special emotional needs due to her lack of evidenced motivation and her demonstrated irresponsibility for his welfare in the past. Dr. Freedman recommended termination of parental rights even if Eric proved unadoptable since the severance of all ties to Dawn and the family in which he had been molested and traumatized in earlier years was therapeutically necessary for his well-being.
In his written report, supplemented after Dawn's failure to appear for the rescheduled appointments in September, Dr. Freedman found his recommendation for termination of parental rights only strengthened:
 Dawn H. is herself a disturbed young woman, and even if she were interested in taking care of Eric, she probably would be incapable of doing so. However, she has shown no such interest, has had no contact with Eric, and has done nothing but CT Page 3877 disappoint him by occasionally making promises to see him or get him things . . . In order to help him overcome the effects of past molestation, to help avoid a lifetime of emotional disturbance and the strong potential to himself to become a sex offender, he will need a strong commitment from dedicated, capable adults. Termination of his parent's rights would be an important first step.
(State's Exh. B., 5th page.)
Cephas Nolan, Eric's therapist for the 21 months before he began day treatment at Child and Family Service in July of 1990, found significant the fact that Eric never discussed his mother in his therapy sessions except in connection with the incident when she had been shot. He did not appear to regard her even as a sister figure, much less as one in a parenting role. In Nolan's opinion it would be "very important" for Eric's caretaker to be in close touch with the child's therapist and involved in his treatment. Although there had been a short period when Eric had had visits with his father, he appeared no more connected with Christopher F. than with his mother. With day treatment and a stable, highly structured home environment, Nolan predicted that Eric ". . . might be able to avoid institutionalization", but an attempt to reunite him with either parent that aborted would have a negative impact on him that could undo whatever progress he had made thus far in treatment. (Testimony of October 1, 1990.)
After the initial plea hearing on this petition on May 3, 1990, Dawn had met twice with the child's new day treatment therapist, but failed to appear for any subsequently scheduled meeting. The new social worker, assigned after this petition was filed, encouraged Dawn to start regular visitation and contact with the child's therapist. Dawn offered no reasons or excuses for her failure to visit more than once every few weeks when the child lived not more than four blocks from her home and when Dawn was welcome to make her own arrangements to visit at any time. This social worker had asked Diane to keep careful record of every contact made by the mother with Eric; between the two trial dates (August 23, 1990 and October 1, 1990); Dawn had not once travelled the four blocks to see her son.
Adjudication — as of August 23, 1990, the date the petition was last amended.
1. Abandonment While both parents had sporadic contact with the child during his 29 months as a DCYS foster child, neither has ever maintained consistent contact either with the child, CT Page 3878 his caretaker or his legal guardian. Neither has ever formulated a plan for his care, other than to agree to his placement with the paternal grandmother. Dawn, on one occasion, in the course of a telephone call in February of 1990, verbalized a desire to provide for her son; Christopher has not gone that far, giving the circumstances of his life and work schedule as the only reason for his failure to do so. Neither participated in any treatment plan reviews at DCYS nor did they attend court other than for Dawn's appearance at the initial hearing on this petition. While what contact they did have with the child may have been sufficient to preclude a finding of abandonment at common law, it does not rise to the level of a "reasonable degree of interest concern or responsibility" as to Eric's welfare, the definition of abandonment found in subsection (d) of Sec. 17-43a. It is, therefore, found by clear and convincing proof that both parents have abandoned this child within such statutory definition.
2. Failure to rehabilitate. In July of 1988, Dawn was making a home for her two younger children and was expecting a third imminently. None of these children have ever been out of her legal custody. In the more than two years since that date of commitment, she has continued to provide for Eric's three younger siblings, but has done nothing to prepare to make a home or Eric: Her visits have been sporadic and infrequent, despite his placement in walking distance of her house and the open invitation by the paternal grandmother to visit more often. A brief involvement with the child's therapist on the eve of trial stopped after two sessions. Just as she failed to appear in court for her son's commitment in 1988, so she had failed to appear for either day of trial on the instant petition despite conformation of her awareness of both. She is no closer to being able to care for Eric in August of 1990 than she was in July of 1988. This constitutes clear and convincing proof that she has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child."
This ground was not pleaded as to Christopher F. because, at the time of the neglect adjudication, his acknowledgement of paternity had not been disclosed to DCYS, and hence he had not been made a party to that proceeding. A year after commitment, however, in connection with a support proceeding instituted by the Bureau of Collection Services, the fact of his acknowledgment of paternity was made known and he appeared in court and agreed to a support order. No evidence was offered as to his compliance or noncompliance with such order. At that CT Page 3879 time, however, he offered no plan for his son's care. In 1990, when asked by the most recent social worker for his suggestions for placement in case his mother became unable to continue caring for the child, he stated that his "living and working circumstances" precluded the inclusion of Eric as one of his own responsibilities. In the two intervening years, even when the child was placed with his mother, his visitation while unproblematic was irregular and infrequent. He, too, therefore is no nearer to making a plan for Eric's care in 1990 than he was two years earlier. Had this ground been pleaded as to Christopher F., it, too, would have been deemed supported by clear and convincing proof.
3. Absence of Parent-child relationship. Dawn failed to keep the rescheduled appointments for Dr. Freedman to evaluate Dawn's parenting capacity and the nature of her relationship with Eric. Christopher at no time during the course of these proceedings had made himself available for inclusion in any clinical evaluation. Based upon the paucity of Eric's contacts with both parents, and the observed close bond that he has developed with his paternal grandmother, there is no basis in this record to infer that there could exit between Eric and either parent the kind of relationship "that ordinarily develops as result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." That fact alone, however, is not grounds to terminate parental rights. The court must also find by clear and convincing proof that "to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child." Such proof exists in this record as to both parents: Dawn was, or should have been, aware in October of 1989 that Diane F. had declined to accept guardianship of this child because of concerns about her health. Dawn did not then come forward with a plan to care for him herself. Not until notified four months later that DCYS would be seeking termination of parental rights did she make a single phone call to express an interest in providing a home for Eric. Informed that the first step in this direction would be frequent and regular visitation, she did nothing to change the past pattern of infrequent and irregular contacts with the child — most of them taking place when she dropped a younger child off at the foster home for baby sitting. Christopher F. has not even gone so far as to articulate an intention of planning for Eric; he informed DCYS that his "schedule" would not permit him to do so. Under these circumstances, considering the length of time the child has already spent in foster homes and the abuse and neglect that preceded his placement in foster care, the evidence is both clear and convincing that the allowance of still more time in the hope of establishing a parent-child CT Page 3880 relationship between Eric and either of his parents would be detrimental to the best interests of this emotionally fragile, traumatized child. Unrebutted testimony from two expert witnesses recommended in strongest terms the securing of a permanent and nurturing home for Eric as quickly as possible and the severance of all ties with his family of origin.
Disposition — on facts as of 10/1/90, the final trial day
No changes occurred between the adjudicatory date and the final day of trial, five weeks later. Dawn did not visit the child at all, and failed to appear at both of the clinical appointments which had been rescheduled at the request of her attorney. Christopher continued to stay aloof from the proceedings.
Before a court may terminate parental rights, however, it must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) No services were offered by DCYS to facilitate the reunion of the child with either parent in the absence of any expression of interest in reunification. On a single occasion Dawn expressed a desire to do so and was invited to visit often and regularly and to participate in the child's counselling. Her infrequent and sporadic visitation pattern, however, did not change: Diane recalled perhaps three visits in the six months preceding the first trial date, and no visits occurred thereafter. She did keep two appointments with the child's therapist shortly before the first trial date, but missed all subsequent appointments. Christopher, never having suggested becoming Eric's caretaker himself, was not amenable to an offer of reunification services. Nothing could have been done to facilitate Eric's return to either parent in view of their demonstrated lack of motivation for such reunion.
(2) Christopher was never subject to any court order since he failed to participate in all hearings concerning his son's custody. Dawn was repeatedly asked to attend clinical evaluations and attended one out of two scheduled in 1988 and none out of four scheduled in 1990. Since she did not attend the final court hearing concerning the 1988 neglect petition, no court expectations had been spelled out for her, but at the first suggestion that she might be interested in making a home for this child, she was invited to visit more frequently and engage in counselling and did neither.
(3) Eric's feelings and emotional ties are clearly with his paternal grandmother with whom he has lived for 20 months. His relationship with his parents is friendly, casual, CT Page 3881 unproblematic but unimportant to his emotional well being.
(4) At six, Eric has known safety for only the last third of his life. The trauma of his early years with his mother and her parents will take years of treatment, if not institutionalization. His need for a safe and permanent home base is even more acute than for children of his age who have not been so traumatized.
(5) Neither parent has done anything to adjust their circumstances, conduct or conditions to make it in Eric's best interest to return to either of their homes in the foreseeable future: He has never lived in the home of his father who has never voiced any intention of inviting him to do so; his mother, once, in a telephone call eight months before the dispositional date, expressed an intent to make a home for him if Diane F. could not, but has done nothing to further that aim. Contact with both parents has been infrequent, casual, a matter of indifference to both the child and apparently to both adults involved.
(6) No one prevented either parent from maintaining a meaningful relationship with the child. On a single occasion Dawn was told by the paternal grandmother that she could not take the child for a visit away from his home on his seventh birthday. Considering her expressed intention, after being shot by her boyfriend in May, of taking Eric and the other children and moving out of state, this restriction on that occasion was not unreasonable. Further, Dawn at that time had a court-appointed attorney with whom she had spoken a few days before, and made no protest as to the restriction on this birthday visit. Instead, she failed to visit the child at all on his birthday, or at any other time prior to the final day of trial six weeks after his birthday.
Having considered the foregoing, as well as the clear testimony of the two clinical witnesses, both of whom had had extended exposure to the child over long periods of time, it is found by clear and convincing evidence to be in the child's best interests for his parents' rights to be terminated so that he may know, if not the permanency of adoption, at least the comparative security of permanent foster care. It is therefore ORDERED that the parental rights of Dawn H. and Christopher F. in and to their son Eric H. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption or in some other suitable and permanent caretaking situation, and to ensure this end it is further ORDERED that said Commissioner submit a report in writing to this court within 90 days of the date of this judgment, and CT Page 3882 thereafter in such intervals and forms as this court may from time to time require. If the child is not in a finalized adoption by March 1, 1992, the said Commissioner is further ORDERED to submit a Motion to Review Plan for Terminated Child on or before that date in order to comply with Federal Law.
Appeal
The parents have 20 days from the date of this judgment in which to seek an appeal. If, after being informed by trial counsel of the court's judgment and the right to take an appeal, either affirmatively manifests a desire to do so, if such trial counsel is willing to act in that capacity, the court will appoint her for this purpose. If either respondent manifests a desire to take an appeal, and if trial counsel declines to represent the parent because in her professional opinion it lacks merit, such attorney is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the parent on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent parent will be informed by the clerk forthwith of the balance of the extended appeal period in which to secure their own counsel who, if qualified, may be appointed to represent that parent on the appeal. If this is not done, then upon expiration of the extended appeal period, the right to pursue an appeal will be ended and the termination of parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965)), they are even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications. CT Page 3883
Entered at Hartford this 30th day of November 1990
Brenneman, Judge